IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| GRM MANAGEMENT, LLC, <br> and <br> SN HOLDINGS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> THE CINCINNATI INSURANCE <br> COMPANY, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 3:16CV574-HEH <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION
(Granting Defendant's Motion for Summary Judgment)

Plaintiffs GRM Management, LLC, and SN Holdings, LLC, (collectively "GRM") brought suit against The Cincinnati Insurance Company ("Cincinnati") for breach of a business insurance policy ("the Policy") issued by Cincinnati. GRM alleges that Cincinnati breached the terms of the Policy by failing to issue a timely coverage decision after GRM notified Cincinnati of a theft loss caused by Donald Moore ("Moore"), GRM's former maintenance worker.

This matter is before the Court on Cincinnati's Motion for Summary Judgment (ECF No. 22), filed on February 28, 2017. Both parties have submitted memoranda and exhibits in support of their respective positions. The Court heard oral arguments on April 4, 2017.

1

For the reasons discussed herein, the Court will grant Cincinnati's Motion. Consequently, this case will be dismissed with prejudice.

I.  BACKGROUND

GRM owns and operates the Grand Magnuson Hotel and Conference Center, a seven-story hotel in Richmond, Virginia. (Pls.' Mem. Opp'n 1, ECF No. 29.)[1] GRM acquired two insurance policies for the hotel, each from a different insurer and covering different risks. The first was an all-risk commercial property insurance policy from Great American Insurance Company ("Great American"). (*Id.*) The Great American policy excluded coverage for theft by employees or any person to whom GRM entrusted the insured property. (*Id.*) Additionally, GRM purchased the Policy in dispute from Cincinnati, which covers up to $100,000 in losses "resulting directly from 'theft' committed by an 'employee'...." (Notice of Removal Ex. 1 at 84 [hereinafter "Policy"], ECF No. 1-1.)

The Policy defines the term "employee" as "[(1)] any natural person in [GRM's] service ...; [(2)] who [GRM] compensates directly ...; [(3)] and [w]ho [GRM] has the right to direct and control while performing services ...." (*Id.* at 94.) The Policy also sets out the duties of the insureds in the event of loss, which state in pertinent part that GRM "must" notify Cincinnati of any loss "as soon as possible" and submit "a detailed, sworn proof of loss within 120 days." (*Id.* at 88.) Further, the Policy states that GRM may not bring an action against Cincinnati "unless [GRM] ha[s] complied with all the terms" of the Policy. (*Id.* at 89.)

---

[1] The Court cites to the pagination as indicated by Court's electronic document filing system.

2

GRM hired Moore pursuant to a "sub-contractor" agreement signed on July 31, 2013. (Def.'s Mem. Supp. Ex. 2, ECF No. 23-2.) The agreement specifies that GRM hired Moore to perform "casual labor and maintenance services . . . to be delivered per project." (*Id.*) GRM disclaimed any responsibility or liability "on behalf of the Sub-Contractor. Conversely, the Sub-Contractor assume[ed] all liabilities and [agreed to] indemnif[y] [GRM] without restrictions whatsoever from whomsoever." (*Id.*) GRM agreed to pay Moore "no more than $1500" per project on a biweekly basis and provided Moore with a hotel room for a limited time at a rate of $60 per night. (*Id.*) Moore was responsible "for meeting all regulatory obligations, taxes, [and] insurance" incurred while providing services to GRM. (*Id.*) The agreement further states that "[i]n no way or form does this agreement form an employer-employee relationship." (*Id.*)

It is undisputed that GRM suffered a loss in September 2013, resulting directly from a theft committed by Moore while providing services to GRM. (Pls.' Mem. Opp'n 2; Compl. ¶¶ 15–19, ECF No. 1-1.) The loss involves personal property and various materials, including copper and aluminum from rooftop HVAC units. (Comp. ¶ 19.) Moore pleaded guilty to criminal charges related to the property theft underlying GRM's insurance claim. (*Id.* ¶ 16.)

GRM notified both insurers of the loss in September 2013. On October 14, 2013, Anil "Neal" Patel ("Patel"), the hotel's general manager and GRM's sole member, spoke with David Crews ("Crews"), a field claims superintendent with Cincinnati. (Crews Aff. 1, ECF No. 23-1.) Patel informed Crews that Moore, "a subcontracted employee," committed the theft but that GRM would file a claim with Great American. (*Id.*; Pls.'

3

Mem. Opp'n 5.) Cincinnati closed GRM's file and took no further action at that time. (Crews Aff. 1.)

In the meantime, GRM filed a claim with Great American for the loss. (*See* Pls.' Mem. Opp. 2.) Great American disputed coverage and filed suit for declaratory judgment. (*Id.*; *see Great Am. Ins. Co. v. GRM Mgmt.*, No. 3:14-cv-295 (E.D. Va. filed Apr. 24, 2014).) Great American argued that Moore was an employee of GRM or, alternatively, that GRM entrusted the insured property to Moore, thus excluding the loss from coverage under the Great American policy. (Complaint ¶¶ 83, 87, *Great Am. Ins. Co. v. GRM Mgmt.*, No. 3:14-cv-295 (ECF No.1).) GRM filed a counterclaim for breach of contract, based predominantly on the assertion that Moore was an independent contractor, rather than an employee. (Counterclaim, *Great Am. Ins. Co. v. GRM Mgmt.*, No. 3:14-cv-295 (ECF No.10).)

During the Great American litigation Patel provided ample testimony regarding GRM's operations. Initially, Mike Bohlen, a claims adjuster for Great American, conducted a videotaped interview with Patel. (Pls.' Mem. Opp'n Ex. B [hereinafter "Patel Interview Video"], ECF No. 29-2.) In the interview, Patel discussed GRM's general personnel practices and the conditions surrounding the September 2013 loss. (*See generally id.* at mins. 11–15, 49–55.) Patel stated that after GRM purchased and began operating the hotel, GRM kept two maintenance employees who were hired by the previous owners. (*Id.* at mins. 11–12.) Subsequently, GRM fired those two maintenance employees and hired additional maintenance workers "as subcontractors because it was hard to . . . manage these maintenance folks. Unless you gave them an explicit list of

4

what needs to be done on a daily basis, they would sit around twiddling their thumbs."
(*Id.* at mins. 13–14.)

Patel also submitted to an Examination Under Oath ("EUO"), taken on November 20, 2013. (Patel EUO; ECF No. 23-4 to 23-7.) Patel discussed Moore's employment relationship with GRM at length. (*Id.*) Patel expressed his preference for hiring maintenance personnel as independent contractors, rather than payroll employees, "to limit [his] liability from a compensation perspective." (Patel EUO 3, ECF No. 23-6.) Patel repeatedly characterized Moore as an independent contractor who was "responsible for [his] own taxes, insurance, [and] liability." (*Id.*) Patel stated that nobody at the hotel supervised Moore, and that Patel required only that Moore complete his assigned tasks. (*Id.* at 6.) Patel stated that Moore did not have a weekly hour-requirement but worked on a job-by-job basis to prevent the relationship from looking like "employment." (*Id.* at 5.) When given a task, Moore had to "use [his own] resources" to complete it, he could conduct his work remotely when possible, and he was allowed to complete the assignment on his own schedule. (*Id.*) Moreover, Patel allowed Moore to maintain other employment provided that he completed any projects assigned by GRM. (*Id.*)

Great American deposed Moore as well. (Moore Dep., ECF No. 29-1.) Moore stated that GRM expected him to work "a 50-hour work week" and that Patel constantly assigned him new tasks. (Moore Dep. 28, 33–34.) Further, Moore stated that GRM "held [him] as an employee" and that he was the only person in charge of maintenance for the hotel. (*Id.* at 7, 34.) While working for GRM, Moore was only reachable via his personal cell phone, had to use his own tools, had to use his personal contacts to procure

5

parts and supplies, and would receive assignments from Patel and various other hotel employees. (*Id.* at 38.)

Subsequently, GRM and Great American settled their case for an undisclosed amount. (Pls.' Mem. Opp'n 3.) Shortly thereafter, on January 5, 2015, GRM contacted Cincinnati once again regarding the September 2013, theft loss and requested a blank proof of loss form. (Def.'s Mem. Supp. Ex. 5, ECF No. 23-8.) Cincinnati provided the requested proof of loss form, directed GRM to the coverage conditions in the Policy, and reserved any coverage decision until a claim was properly before it. (Def.'s Mem. Supp. Ex. 6, ECF No. 23-9.) On May 19, 2015, GRM submitted a proof of loss form and supporting documentation to Cincinnati. (Def.'s Mem. Supp. Ex. 7, ECF No. 23-10.) In response, Cincinnati requested documentation regarding Moore's employment, including his W-2, and directed GRM to submit a new proof of loss completed on Cincinnati's standard form, rather than a third-party form as previously submitted by GRM. (Def.'s Mem. Supp. Ex. 8, ECF No. 23-11.) On July 9, 2015, GRM submitted a second proof of loss form in accordance with Cincinnati's request and stated that no W-2 form was available for Moore because none was prepared "before his employment was terminated."[2] (Def.'s Mem. Supp. Ex. 9, ECF No. 23-12.)

---

[2] However, the record does contain a W-2 form for Moore. (*See* Pls.' Br. Opp'n Ex. C, ECF No. 29-3.) In any event, it is clear from the record that GRM compensated Moore directly, as required by the Policy.

GRM filed this suit against Cincinnati in the Circuit Court for the City of Richmond on July 24, 2015. (Notice of Removal at 1, ECF No. 1.) Cincinnati removed the suit to this Court on July 8, 2016. (*Id.*)

GRM argues that Cincinnati breached the policy by failing to promptly make a coverage determination after GRM notified Cincinnati of the theft loss and provided a sworn proof of loss form on May 19, 2015.[3] (Pls.' Mem. Opp'n 9–10.) At the time of filing, Cincinnati had not issued a coverage decision regarding GRM's claim. However, Cincinnati denied GRM's claim on January 12, 2017. (Def.'s Mem. Supp. Ex. 15, ECF No. 24-5.)

Cincinnati moved for summary judgment. Its central argument is that it is not required to cover the loss because Moore was not an "employee," as defined by the Policy.[4] (Def.'s Mem. Supp. 18–26.)

---

[3] GRM's theory of breach of contract is dubious. GRM argues that Cincinnati had "an obligation to accept or deny the claim[] 'within 15 working days after receipt by the insurer of properly executed proofs of loss.'" (Pls.' Br. Opp'n 11 (citing 14 Va. Admin. Code § 5-400-60).) While § 5-400-60 appears to establish such a requirement, Va. Code § 38.2-510(B), the statutory authority for § 5-400-60, does not give rise to a private cause of action, stating that "[n]o violation of this section shall of itself be deemed to create any cause of action in favor of any person other than the [State Corporation] Commission . . . ." Moreover, the Court notes that Cincinnati denied coverage on January 12, 2017. To the extent GRM believes Cincinnati is still in breach of the Policy, the Court will construe the current action as a general claim for breach of contract.

[4] Additionally, Cincinnati argues that GRM's claim is precluded because GRM failed to submit a sworn proof of loss within 120 days of discovery of the loss, as required by the Policy. However, it is settled that "a policy requirement that the insured should file a proof of loss within [a certain time after discovery of the loss] should be construed to require that it shall, unless waived, be filed before suit is brought." *Ramsey v. Home Ins. Co.*, 125 S.E.2d 201, 204 (Va. 1962) (citing *S. Home Ins. Co. of the Carolinas v. Bowers*, 161 S.E. 914 (Va. 1932)). Regardless of the wisdom behind such a rule, the law merely requires that GRM file a proof of loss before suit is brought, which they did twice. Therefore, the Court finds that this argument fails as a matter of law.

7

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the record shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidentiary basis on which such motions are resolved include depositions, answers to interrogatories, admissions on file, together with affidavits, if any. Fed. R. Civ. P. 56(c). As the United States Supreme Court held in *Anderson v. Liberty Lobby, Inc.*, the relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." 477 U.S. 242, 251–52 (1986). In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party—here, GRM. *Id.* at 255.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. A material fact is one that might affect the outcome of a party's case. *Anderson*, 477 U.S. at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A genuine issue concerning a material fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to warrant a reasonable jury to return a verdict in that party's favor. *Anderson*, 477 U.S. at 248.

To defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation or the building of one inference upon another[,]" or the "mere existence of a scintilla of evidence" concerning a material fact. *Stone v. Liberty*, 105 F.3d 188, 191 (4th Cir. 1997) (internal citations omitted). In meeting this burden, the nonmoving party must "go beyond the pleadings" and present affidavits or designate specific facts in depositions, answers to interrogatories, and admissions on file to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III. DISCUSSION

Cincinnati argues that the Policy excludes the loss because Moore was not an "employee," but rather an independent contractor. The Court agrees.

In Virginia, the interpretation of insurance policies is governed by general principles of contract construction. *Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co.*, 397 S.E.2d 876, 877 (Va. 1990). "[I]f policy language is clear and unambiguous, we do not apply rules of construction; rather, we give the language its plain and ordinary meaning and enforce the policy as written." *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir. 2004) (citing *P'ship Umbrella, Inc. v. Fed. Ins. Co.*, 530 S.E.2d 154, 160 (Va. 2000)).

The Court must "examine the words in light of their usual and customary meaning to determine whether they are clear or ambiguous . . . ." *Am. Reliance Ins. Co. v. Mitchell*, 385 S.E.2d 583, 586 (Va. 1989). "It is the duty of courts to construe the policy as a whole; and, in the performance of that duty, courts may not treat as meaningless any

word thereof, if any meaning, reasonably consistent with other parts of the contract, can be given." *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 800 F. Supp. 2d 722, 731 (E.D. Va. 2011) (citing *Smith v. Ramsey*, 82 S.E. 189, 191 (Va. 1914)), *aff'd sub nom. Suntrust Mortg., Inc. v. United Guar. Residential Ins. Co. of N. Carolina*, 508 F. App'x 243 (4th Cir. 2013).

Policy language is ambiguous only "when it may be understood in more than one way or when such language refers to two or more things at the same time." *Salzi v. Virginia Farm Bureau Mut. Ins. Co.*, 556 S.E.2d 758, 760 (Va. 2002) (citing *Lincoln Nat. Life Ins. Co. v. Commonwealth Corrugated Container Corp.*, 327 S.E.2d 98, 101 (Va. 1985)). Only when "the policy language is ambiguous and the intentions of the parties cannot be ascertained, the policy must be construed strictly against the insurer and liberally in favor of the insured, so as to effect the dominant purpose of indemnity or payment to the insured." *Seabulk Offshore, Ltd.*, 377 F.3d at 419 (citing *St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co.*, 316 S.E.2d 734, 736 (Va. 1984)). "[A]n ambiguity, if one exists, must be found on the face of the policy." *Salzi*, 556 S.E.2d at 760 (quoting *Nationwide Mutual Ins. v. Wenger*, 287 S.E.2d 874, 877 (Va. 1981)).

Both parties cite to various Virginia cases interpreting the word "employee," but their reliance on case law is misplaced. The Court need not look beyond the Policy, which it finds unambiguous. The Policy defines "employee" as "[(1)] any natural person in [GRM's] service . . . ; [(2)] who [GRM] compensates directly . . . ; [(3)] and [w]ho [GRM] has the *right to direct and control while performing services* . . . ." (Policy at 94 (emphasis added).) There is no dispute that GRM satisfies the first two elements: Moore

10

is a natural person who provided services to GRM, and GRM compensated Moore directly. Therefore, the only issue for the Court to decide is whether GRM had the right to direct and control Moore while performing his services. The Court finds that it did not.

While it is clear that GRM directed the ends of Moore's work, it is equally clear that it did not control the means by which Moore's work was conducted. Patel declared under oath that Moore had considerable flexibility in the performance of his duties, was not supervised by anyone at GRM, did not have a weekly hour-requirement, and worked on a project-by-project basis. (Patel EUO 5–6.) Moore had to use his own resources to complete projects, could complete his GRM work away from the hotel, and was allowed to maintain outside employment. (*Id.* at 5.) Patel only required that Moore complete his assigned tasks. (*Id.* at 6.) Thus, Patel's statements contravene the notion that GRM had the right to direct and control Moore *while* he was performing his services.

Moreover, Moore was hired pursuant to a "sub-contractor" agreement that explicitly disclaimed any employment relationship. While the Court does not rely on the labels used by the parties to describe their legal relationship, GRM disavowed "all liabilities" arising from the relationship, including any taxes or regulatory burdens incurred by Moore in his performance of services. (Def.'s Mem. Supp. Ex. 2.) Further, the Court is not persuaded by GRM's unsupported argument that Moore "signed the agreement for tax purposes" only. (Pls.' Mem. Opp. 8.) Patel's EUO and his videotape interview with Mike Bohlen demonstrate that he was acutely aware of the legal implications of retaining Moore's services as an independent contractor, rather than an

employee, and that Patel regularly hired maintenance workers as contractors, not as employees. (Patel EUO 3, ECF No. 23-6; Patel Interview Video at mins. 13–14.)

GRM asserts that Moore's employee status is a genuine issue of material fact that must proceed to a jury. The Court notes that "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 248 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968); Fed. R. Civ. Pro. 56(e)).

The core of GRM's argument is that the record is "replete" with testimony that specifically identifies the actual control that GRM had over Moore. (Pls.' Suppl. Mem. Opp. 4, ECF No. 32.) In support, GRM points to Patel's recorded interview with Mike Bohlen and to Moore's deposition. However, the Court finds that neither lend credence to GRM's argument.

GRM highlights the portions of Moore's deposition where he refers to himself as an "employee." For example, Moore stated that GRM expected him to work "a 50-hour work week" and that Patel constantly assigned him new tasks. (Moore Dep. 28, 33–34.) Further, Moore stated that GRM "held [him] as an employee" and that he was the only person in charge of maintenance for the hotel. (*Id.* at 7, 34.) The Court finds that Moore's testimony clearly shows that GRM directed the ends of Moore's work, but it does not go so far as to show that GRM controlled Moore while he was working.

In actuality, Moore's testimony suggests just the opposite—that GRM did not have the right to control Moore. While working for GRM, Moore was only reachable on

his personal cell phone, had to use his personal tools, and had to use his personal contacts to procure parts and supplies. (*Id.* at 38.) Certainly, Patel verified that Moore completed his tasks, but the record does not reflect that GRM had the right to control the means of Moore's work.

Patel's videotaped interview provides no additional support for GRM's argument. GRM contends that Patel affirmatively referred to Moore as an employee during the interview. (Pls.' Mem. Opp'n 21.) However, the Court disagrees with that characterization. In the exchange to which GRM refers, Mike Bohlen, the interviewer, asked Patel if any hotel employees were present while roofers were working at the hotel. GRM highlights that Patel responded with "I've got Donnie [Moore] to basically work with them." GRM conspicuously omits the fact that Patel had previously established that Moore was merely a sub-contractor and that immediately after Bohlen's question, Patel shook his head, indicating that no employees were with the roofers. (Patel Interview Video at min. 51.) Moreover, even if Patel had used the word "employee" to refer to Moore, GRM correctly points out that such characterization would amount to nothing "more than an opinion by a layperson." (Pls.' Mem. Opp'n 8 (referring to Patel's EUO).)

Further, Patel's interview suggests that GRM did not exercise actual control over Moore's work. For instance, Patel tasked Moore with fixing an external fan used to extract hot air from the hotel's conference room. (Patel Interview Video at mins. 40–41.) A week later, Patel realized that Moore had not repaired the fan as instructed. (*Id.* at min. 41.) Patel had to direct Moore to fix the fan a second time before Moore complied. (*Id.*) Thus, Patel's testimony lacks support for GRM's argument that it exercised sufficient

control over Moore for him to be considered an employee.

Lastly, GRM argues that the credibility of Patel's testimony is an issue for the jury to decide. The Court notes that "a party is not bound by every statement that is made, his testimony as a whole must be considered, and if reasonable men could differ on whether his testimony clearly and unequivocally put him out of court, his case must go to the jury." *Util. Control Corp. v. Prince William Const. Co.*, 558 F.2d 716, 720 (4th Cir. 1977) (internal citations omitted). However, the record before the Court shows no contradiction that would prompt reasonable people to disagree on whether Patel's testimony shows that GRM had the right to control the means of Moore's work. Any such discrepancy exists only in GRM's pleadings. GRM had ample opportunity to offer truly contradictory evidence or file additional affidavits to attack the reliability of Patel's testimony. But it failed to offer any such evidence. Therefore, the Court finds that there is no genuine dispute that GRM lacked the right to direct and control Moore while performing his services.

## IV.   CONCLUSION

The Court finds that GRM has failed to present evidence to defeat Cincinnati's properly supported Motion for Summary Judgement. GRM alleges that the record is replete with contradictions regarding Moore's employment status, but the Court finds that the evidence only supports the conclusion that Moore was not GRM's employee as defined by the Policy.

Therefore, the Court will grant Cincinnati's Motion for Summary Judgment. This case will be dismissed with prejudice.

An appropriate order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: May 1, 2017
Richmond, VA